UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM HARRY HACKEL,

    Petitioner,

v.

JAMES GILCHRIST,

    Respondent.
                                   /

Case No. 04-73274

Honorable Nancy G. Edmunds

**ORDER ACCEPTING IN PART AND REJECTING IN PART MAGISTRATE JUDGE'S AUGUST 17, 2007 REPORT AND RECOMMENDATION [20]**

This matter comes before the Court on the Magistrate Judge's August 17, 2007 Report and Recommendation ("R&R")[51] and Objections filed by both Petitioner and Respondent. Being fully advised in the premises and having read the pleadings, the Court ACCEPTS the Magistrate's Report and Recommendation as to its recommended denial of a writ of habeas corpus on Petitioner's claimed Confrontation Clause error (R&R at 21-24) and on Petitioner's claimed ineffective assistance of counsel (R&R at 24-27). The Court REJECTS the Magistrate's Report and Recommendation as to its recommended grant of a conditional writ of habeas corpus ordering the state trial court to conduct an additional *Remmer*[1] hearing that reconsiders the jury taint question it previously addressed. The Michigan Court of Appeals' decision, holding that the trial court, at the *Remmer* hearing, sufficiently investigated the jury taint issue in a manner that ensured that Petitioner's constitutional right to an impartial jury was not violated, was not contrary to and

---

[1] *Remmer v. United States*, 347 U.S. 227 (1954).

did not involve an unreasonable application of clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to habeas relief.

## I. Background

Following a jury trial, Petitioner was convicted of two counts of third-degree criminal sexual conduct. He was sentenced to concurrent terms of three to fifteen years imprisonment. Petitioner, however, has completed his sentences and has been discharged. Before his release, Petitioner filed his habeas petition, brought pursuant to 28 U.S.C. § 2254, challenging his conviction.

Petitioner's case was prosecuted by the prosecuting attorney for Isabella County after an initial investigation by the Saginaw Chippewa Tribal Police. Trial started on Monday, April 17, 2000, the week before Easter. It continued through Thursday of that week. There was no trial on Friday. Trial resumed on Monday, April 24, 2000. In either the late morning or early afternoon of Tuesday, April 25, 2000, the prosecuting attorney's staff was contacted and advised that a sitting juror, Juror # 43 - Dan Morden - , had been offered employment as a dispatcher out at the central dispatch for the Saginaw Chippewa Tribal Police. (4/25/00 Sep. Rec. Tr. at 11-12.) The prosecuting attorney's staff passed him a note to this effect during trial on that Tuesday. (*Id.* at 12.) He immediately notified both defense counsel and the Court of these facts. Upon learning this information, at the first afternoon recess, the trial court summoned all counsel to chambers to discuss how to proceed. (*Id.*) Trial resumed for the remainder of the afternoon. At the conclusion of trial that day, the trial court dismissed all but counsel and Juror #43. (Trial Tr., Vol. III at 1007.) Then, at 5:20 p.m. on April 25, 2000, a separate record was made of the trial court's

2

investigation into the circumstances surrounding Juror #43's being offered a job as a dispatcher by the Saginaw Chippewa Indian Tribe, Central Dispatch. (4/25/00 Sep. Rec. Tr. at 3.)

### 1. *Remmer* Hearing

Those present at the hearing included the trial judge, Isabella prosecuting attorney Larry Burdict, defense counsel James Howarth and Daniel Waller and Juror #43. The trial court placed Juror #43 under oath and offered counsel the opportunity to question him about his recent hiring by the Saginaw Chippewa Indian Tribe. Counsel stated their preference that the Court make the inquiry, and it did so. (*Id.* at 3.)

The Court asked Juror #43 when he was first notified of the job offer. Juror #43 clarified that, although he had received and left a telephone message about the job offer on Thursday, April 20, 2000. It was not until Friday, April 21, 2000, when he personally accepted the offer of employment, which was conditioned on his passing TB and drug testing. At the time of the hearing, he was still waiting for the results of the drug test.

> A. Let's see, I got a telephone message last week. I believe it was Wednesday, but I did not get the message until Thursday. And I returned the telephone call to, I believe, Sergeant Davis on Thursday. He said on his message that it was a vacation day, but being a job opportunity I wanted to at least, you know, reply saying that, yes, I will accept the job offer. And I saw him Friday. I went down to see him. And he set me up to go across to Tribal Operations to -- it's a conditional offer of employment is what it is. I have to pass a T B test, which I have the bruise here for, which I passed; and then a drug screen. I'm still waiting for the results of that; but I have no reason to believe that I will fail that.

(4/25/00 Sep. Rec. Tr. at 4.)

3

The trial court made further inquiries. As to a start date, Juror #43 responded that he was not given a start date, although he was told that it would not occur until after the results from his TB and drug tests were obtained, and he told Sergeant Davis that it would have to be at least two weeks after he gave notice at his current job. As to his job duties, Juror #43 testified that the position was for dispatch and correction work within the Tribal Police Department and that the direct supervisor would be Sergeant Davis. (*Id.* at 4-5, 6.)

The trial court specifically asked Juror #43 if the pending criminal matter was discussed with Sergeant Davis.

> Q: Was there any discussion of this case during the course of your contact with the tribe at any time?
>
> A: Well, I felt it necessary to advise Sergeant Davis. When I spoke with him Friday, I told him, you know, I feel it is my duty to advise you that you should know that I am a jury member presently on jury duty. I told him -- you know, I didn't say what case; but I said I'm sure you know what case it's about. And he said that he knew.
>
> Q: He knew the case, or he . . .
>
> A: He said that he knew that apparently I was a jury member, or something like that, or at least he understood the fact that I was a jury member. But I did not mention what case it was or anything like that.
>
> * * *
>
> Q: Did it seem to you that -- was this Sergeant Davis?
>
> A: Yes sir.
>
> Q: That Sergeant Davis was aware that you were a juror in this case?
>
> A: That's what it appeared to me, yes.

(*Id.* at 5-6, 7.)

The trial court further inquired whether Juror #43 felt that he could continue on the jury, render a verdict that was not favorable to the prosecution, and still feel comfortable working at that new job with the person who was the chief investigator in the pending case. Despite Juror #43's assurances that he would not be uncomfortable rendering an unfavorable verdict despite the job offer, the trial court agreed with both the prosecuting attorney and defense counsel that Juror #43 should be excused from jury duty. (*Id.* at 7-9.) Before doing so, however, the trial court asked Juror #43 if he discussed the offer of employment with any of the other jurors. Juror #43 responded that he had told one, a co-worker at Central Michigan University's Human Resources Department, that he was probably getting hired by the Tribe.

> Q: Have you discussed the offer of employment with any of the other jurors?
>
> A: I told one of the other jurors that, yes, I was probably getting hired.
>
> Q: Did you get into any discussion with that juror on how it may or may not impact this case?
>
> A: No.
>
> * * *
>
> Q: Do you recall which juror that was?
>
> A: I know her. She is also employed with me at Central Michigan University, Human Resources. I don't know her number or even her name. Very thin one that sits in the front row. . . .
>
> * * *
>
> Q: One seat down from you?
>
> A: There's the brunette that sits, I believe, immediately to my right, and I think it's one more down.
>
> Q: Okay. And there has been no other discussion among jurors about that?

5

    A: No.

(*Id.* at 9-10.) The trial court then explained to Juror #43 why he was being excused:

> Well, Mr. Morden, I feel compelled to excuse you as a juror in this case. It seems from what I've learned from your testimony that Sergeant Davis knew you were a juror in this case, and offered you employment with the agency that's charged with investigating the case. At best that's ill advised, and at worst that has an appearance of jury tampering which certainly isn't your -- nothing you've done wrong. But I just want you to know the basis for being excused from the jury and understanding it. I'm not accusing anyone of jury tampering; I'm saying what the appearance is. So I guess with that, I'm going to caution you not to discuss the case with anyone until you're contacted by the court; but you may discuss the case after the verdict is rendered. We will contact you personally, a member of my staff will. If anyone asks you anything about the case, you just simply have to tell them that you cannot discuss it under penalty of contempt of this court. It wouldn't be fair to either side for you to discuss it with anyone. We've taken measures to secure the identity of the jurors and secure access to personal information. So I would hope you wouldn't be sought out by anyone; but if you are you just simply have to tell them you can't discuss it, and report the incident to the court.

(*Id.* at 10-11.) The court then thanked Juror #43 for his service, excused him, and arranged for his transportation.[2]

After Juror #43 left, defense counsel thanked the court, remarking that it did "an excellent job of voir diring the witness." (*Id.* at 11.) The court reassured the prosecuting attorney that none of his comments were meant to imply any wrongdoing on the part of anyone in the courtroom but reaffirmed his opinion that the job offer was "ill advised at best, and at worst has an appearance of jury tampering." (*Id.* at 12.) Defense counsel confirmed to the court that the prosecutor had contacted him immediately after learning about the job offer, and it was his understanding that the tribal police advised the prosecutor as soon as they became aware of it as well. An investigator from the tribal police confirmed that he

---

[2]The bus transporting the other jurors to their cars had apparently left.

only became aware of the job offer that day and immediately told the prosecuting attorney. (*Id.* at 12-13.) The court concluded by informing counsel that it would instruct the remaining jurors simply that Juror #43 had been excused. As to the one juror who knew that Juror #43 was offered employment by the Tribe, the trial court told counsel that he was not inclined to make any further inquiries and perhaps "open Pandor's box." (*Id.* at 13.) He advised counsel to think about the situation overnight and to inform the court if they wished to proceed another way. (*Id.* at 13-14.)

The next morning neither party had anything to add, and the trial judge announced in open court that Juror #43 had been excused and that none of the remaining 12 jurors were to attach any importance to that fact. (Trial Tr., Vol. III at 1008-09.)

**2. Court of Appeals Decision**

The Michigan Court of Appeals affirmed Petitioner's conviction and sentence, and the Michigan Supreme Court denied Petitioner's application for leave to appeal. *People v. Hackel*, No. 227737, 2002 WL 31956946 (Mich. Ct. App. Dec. 20, 2002), *lv. denied*, 469 Mich. 875 (2003). On appeal, Petitioner argued (as he does here) that the trial court "committed structural or plain error by failing to sua sponte order a mistrial or question other jurors after it was revealed that the investigating police agency in the case offered employment to a juror." 2002 WL 31956946 at *3. Although the appellate court observed that defense counsels' approval of the trial court's actions constituted a waiver of the issue, it went on to analyze the alleged trial error for plain error. *Id.* (citing *People v. Carter*, 462 Mich. 206, 218-19 (2000)(relying on Supreme Court decisions and distinguishing between waiver, which occurs when defense counsel affirmatively approves a court's action and

thus precludes appellate review of the issue, and forfeiture, which occurs when defense counsel fails to object and thus does not preclude appellate review for plain error)).

The Michigan Court of Appeals concluded that there was no plain error. First, it found that "the trial court conducted a sufficient investigation of the matter to ensure that [Petitioner]'s constitutional right to an impartial jury was not violated when it questioned the juror about the circumstances of the offer of employment, about any discussions he had with other jurors about the offer of employment, and how the offer of employment might effect his ability to decide the case." *Id.* (citing *Smith v. Phillips*, 455 U.S. 209 (1982); and *United States v. Corrado*, 227 F.3d 528, 535 (6th Cir. 2000)). Next, it observed that, unlike the facts in the cases that Petitioner relied upon in his appeal (*People v. France*, 436 Mich 138 (1990) and *Remmer v. United States*, 347 U.S. 227 (1954)), "the instant case did not involve a substantive communication with a deliberating jury" and did "not constitute a communication, directly or indirectly, about the case." *Id.* Finally, analyzing the facts in this case and applying the applicable law, it rejected the same argument that Petitioner raises here -- that it was necessary for the trial court to question other jurors concerning their communication with the excused juror about the case.

> The trial court did not find jury tampering; it only determined that the investigating police agency's conduct in making the offer of employment during trial was, at best, ill advised and, at worst, created an appearance of jury tampering. Further, the trial court instructed the jurors at the outset of the case not to discuss the case with anyone, including other jurors, until it was time to decide the case. "It is well established that jurors are presumed to follow their instructions." *People v. Graves*, 458 Mich. 476, 486; 581 N.W.2d 229 (1998). We find no basis grounded in the excused juror's contact with the investigating police agency that would preclude application of this presumption.

*Id.*

8

## II. Analysis

Contrary to the conclusion in the R&R, the Michigan Court of Appeals' decision was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the Supreme Court. In this case, the trial court conducted a *Remmer*-type hearing regarding the potential taint of Juror #43 as a result of the job offer by the tribal police, and Juror #43 was ultimately excused. An additional *Remmer* hearing is not necessary.

As observed by the Sixth Circuit:

> Where a colorable claim of extraneous influence has been raised, . . ., a "*Remmer* hearing" must be held to afford the defendant an opportunity to establish actual bias. At that hearing, the defendant bears the burden of proving actual juror bias, and no presumption of prejudice arises merely from the fact that improper contact occurred. . . .

*United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (internal quotes and citations omitted). "The nature and scope of the investigation required" was set forth by the Supreme Court in *Remmer*. *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000). "The Supreme Court decided that a hearing was required to 'determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.'" *Id.* (quoting *Remmer*, 347 U.S. at 230). "Although the Court stated that any extraneous contact with a juror was 'presumptively prejudicial,' and that the burden rested on the government to demonstrate that the contact was harmless, . . . , this court has understood the subsequent case of *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L.Ed.2d 78 (1982), to alter that holding such that the defendant now bears the burden of proving juror bias." *Id.* (internal citation omitted).

Here, as the Michigan Court of Appeals correctly observed, the trial court did conduct an investigation concerning the job offer extended to Juror #43. All interested parties participated. Defense counsel was provided ample opportunity to show that actual juror bias on the part of jurors other than Juror #43, and this was not done. The Michigan Court of Appeals properly reviewed the record, concluding that under the facts presented here that there was no plain error. Its decision that the trial court conducted an adequate *Remmer* hearing was a reasonable application of clearly established federal law to the facts of this case. Accordingly, this Court rejects the Magistrate's reasoning and recommendation to grant a conditional writ of habeas corpus and to order the state trial court to conduct an additional *Remmer* hearing (R&R at 10-21).[3]

## III. Conclusion

For the above stated reasons, the Magistrate Judge's August 17, 2007 Report and Recommendation [20] is ACCEPTED IN PART and REJECTED IN PART. Hackel's petition for a writ of habeas corpus is DENIED.

       s/Nancy G. Edmunds
       Nancy G. Edmunds
       United States District Judge

Dated: September 19, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 19, 2007, by electronic and/or ordinary mail.

       s/Carol A. Hemeyer
       Case Manager

---

[3]This Court also observes that, although the R&R and the Objections discuss the issue of procedural default, this case does not involve a procedural default. The juror taint issue was raised and addressed at the first appeal.